# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MAMIE L. SHELTON, | ) | 1:09-cv-02120-GSA |
| | ) | |
| Plaintiff, | ) | **ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT** |
| v. | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## BACKGROUND

Plaintiff Mamie L. Shelton ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Supplemental Security Income benefits pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

//
//

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 9 & 10.

**FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed her application for Supplemental Security Income on May 31, 2007, alleging disability beginning on or around April 18, 2007.  AR 22-23.  Her application was denied initially on July 31, 2007, and on reconsideration in October 2007. AR 40-50.  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 51.  ALJ Thomas J. Gaye held a hearing on August 10, 2009, and issued an order denying benefits on September 8, 2009.  AR 5-13.  Plaintiff requested a review of the decision. AR 4. On October 21, 2009, the Appeals Council denied review.  AR 1-3.

**Hearing Testimony**

ALJ Gaye held a hearing on August 10, 2009, in Bakersfield, California.  Plaintiff appeared and testified.  She was represented by attorney Rosemary Abarca.  AR 14-36.

Plaintiff was fifty-one years old on the date of the hearing.  AR 19.  She graduated from high school and went on to receive an AA degree in business.  AR 19.

Plaintiff lives in Bakersfield, California with her forty-five year old brother who is both mentally and physically disabled.  AR 18-19.  She is her brother's sole caretaker, typically preparing his meals, making sure his bath water is at the proper temperature, laying out his clothing, and tying his shoes to get him ready for his day school with the Association for Retarded Citizens.  AR 19, 31-32. She cares for him in the mornings before school, after school, and evenings. AR 32.

In the past, Plaintiff worked for ten years as a reliability specialist in the oil fields where she tracked oil well performance and production.  AR 20. The job consisted of driving to the various sites, checking the wells, packing them, taking them apart, and putting them back together. *Id*. She chose to leave that job when, as a result of a downturn in the economy, she was required to take on more responsibility.  *Id*.  Thereafter, Plaintiff provided in-home care for disabled persons until she resigned to take care of her brother.  AR 20-21.   Plaintiff also provided childcare full time in her home for about four years. AR 21. Finally, her most recent

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

position was in the concession stand at the Rabobank Arena where she worked for one month. AR 21. Plaintiff has been unemployed since she started experiencing vision problems and dizziness while working at the concessions stand. AR 21.

Plaintiff was seen at Kern Medical Center in April 2007 for vision problems, dizziness and a "spinning" sensation. For example, the symptoms were preventing her from grocery shopping. AR 22-23. She was admitted overnight for observation and testing, and diagnosed with vertigo and multiple sclerosis ("MS"). AR 21-22. She accepted the recommended medications to treat MS when the physicians warned her of the possibility of relapse. Additionally, she was having difficulty standing and walking normally. AR 22. At the time of the hearing, Plaintiff had been on the MS medication for one year and reported her symptoms were "getting better." *Id*. The nature of her current vision problems consist of some involuntary eye movement and decreased vision in her right eye for which she wears prescription glasses. AR 24. Plaintiff is no longer able to read easily due to problems focusing on the lines and letters, and therefore she is unable to concentrate. She is able to spend a total of about half an hour on the computer, for five to ten minutes at a time. AR 30-31. Plaintiff holds an unrestricted driver's license for which she is retested every two years and does frequently drive. AR 24.

Plaintiff experiences an ailment known as foot drop, and therefore has difficulty walking, balancing, and spinning. AR 24-25. Her foot will often drop to the ground unintended. AR 25. She was prescribed an assistive device by a doctor at Kern Medical Center and uses a cane which she needs to help her walk, especially in the afternoons. *Id*.

In addition, Plaintiff suffers from right hip pain for which she takes Ibuprofen. AR 26. She is only able to stand for five minutes at a time, and also has difficulty sitting for long periods. *Id*. She is not sure if she would be able to walk for more than a quarter of a mile and has great difficulty climbing stairs. *Id*.

Plaintiff indicates that two to three times in a typical day, she must rest for fifteen to twenty minutes when she gets fatigued. AR 27. She also suffers from carpal tunnel syndrome ("CTS") in both hands. AR 28. This causes her difficulty lifting and controlling the motion of her hands. *Id*. Since she began wearing the arm braces that she was prescribed, the condition has

3

improved and she is able to lift ten pounds at a time. As an example, Plaintiff indicated she can lift and carry a ten-pound bag of sugar from the car into her home. AR 29. Surgical intervention has not been recommended for the CTS. *Id*.

**Medical Record**

The entire medical record was reviewed by the Court.  Those records relevant to the issues on appeal are summarized below.

*Kern Medical Center*

In or around February 2007, Plaintiff claims to have started experiencing vision problems, dizziness and a "spinning" sensation. AR 131. She went to the emergency room on April 18, 2007, complaining of chest pain, dizziness, and her right eye "not tracking right." AR 189, 191. Plaintiff was admitted overnight for observation and testing, and was found to be mildly obese with mild hypertension, partial nerve palsy, and mild ataxia, a neurological dysfunction in the body. AR 192. Upon release from the hospital, Plaintiff was diagnosed with vertigo, probably secondary to MS, and high blood pressure. AR 131. She was discharged with recommendations to avoid "heavy walking or not to move swiftly around . . . avoid rapid head movements." AR 132. Regarding Plaintiff's vision problems, the diagnoses involved nystagmus, disconjugate eye movement, and intra ocular opthamoplegia. AR 128, 131.

Shortly after the April 18th visit, a diagnosis of MS was confirmed after testing revealed "abnormal synthesis of the gamma globulins in the central nervous system." AR 161. An MRI of Plaintiff's brain revealed "extensive white matter" abnormality. AR 163. Before she was released from the hospital, it was noted that Plaintiff's ability to balance while sitting and standing was good and her gait was fair. AR 171. The examining physician did note that decreased dynamic balance and visual impairment were likely. AR 172.

On May 9, 2007, Plaintiff was prescribed a walking cane, and a low salt diet was recommended. The assessment includes MS, obesity, and high blood pressure. AR 124-125.

On May 29, 2007, Plaintiff was again seen in the neurology department where she complained of headache, vertigo, dizziness, and "room spinning." AR 126. The attending physician noted that Plaintiff reported that her vision seemed to be getting worse and that her

symptoms were exacerbated by heat and activity. *Id*. The physician referred her to the neurology clinic at the next available date, and prescribed Betaseron injections to counteract the progression of MS. *Id*.

During Plaintiff's June 2007 follow-up visit to the clinic, she reported that was not having any problems with her daily activities. She did not suffer from headaches or dizziness, but did encounter occasional neck pain and "bumping into people." AR 128. She had not yet started her medical treatments for MS, and was still taking Meclizine as prescribed on her initial visit. *Id*. She was prescribed Lisinopril for her high blood pressure. *Id*.

On July 25, 2007, Plaintiff was seen for a follow-up visit. AR 199. She reported zero pain, and no problems with performing daily activities. *Id*. She denied any neurosymptoms, blurry vision, or weakness. *Id*. Plaintiff reported occasional hip pain when lying down. *Id*. She had yet to start the Betaseron injections for MS for fear of side effects, and wanted to try taking it only once per week instead of the prescribed once per day. *Id*. She was counseled regarding the importance of using the medication as prescribed. *Id*.

During an August 28, 2007, neurology clinic follow-up, Plaintiff complained of dizziness while looking up. AR 203. She reported zero pain and no problems with daily activities or ambulating. *Id*. It was again noted that Plaintiff was not yet taking her Betaseron injections to treat the MS. *Id*.

On September 25, 2007, the Plaintiff reported to the emergency department complaining of lower back pain. AR 216. The pain began five days prior and was not the result of any trauma. *Id*. She was treated with Morphine and Reglan. AR 217. Further, Plaintiff was prescribed Vicodin and Motrin for pain. AR 218. The clinical impression was acute lumbar strain. *Id*.

On May 22, 2008, Plaintiff was seen in the clinic. AR 272. She had no complaints of pain or difficulties in daily activities. She complained of a "'jiggly'" feeling and discomfort in her eyes in direct sunlight. MS, hypertension, and obesity were noted. She was given a prescription for hypertension medication and, referred to the opthalmology and neurology departments, as well as the blood pressure clinic. AR 272-273.

In June 2008, the Plaintiff attended the recommended blood pressure clinics. AR 268-271. Treatment notes indicate that she complained of vision problems; hypertension was controlled by medication. AR 268.

On July 17, 2008, Plaintiff reported no problems with her daily activities or ambulation. AR 265. She complained of headaches once a day at a pain level of eight on a ten point scale. *Id*. The assessment includes MS, hypertension, obesity and tension headaches. *Id*. An EKG and echocardiogram were ordered and Plaintiff was referred to the eye clinic. AR 267. It was noted the hypertension was stable, yet Plaintiff was not taking the medication prescribed to treat MS. AR 266.

On July 22, 2008, Plaintiff reported to the neurology clinic for a follow-up visit. AR 262. She complained of occasional pain in her right leg in the evenings, decreased sensation in her fingers without tingling, decreased vision in her right eye, occasional fatigue, and an involuntary movement of her mouth. *Id*. The examination revealed decreased sensation in her left leg with normal strength limits, possible carpal tunnel syndrome, and a possible facial tic. *Id*. Plaintiff was referred to the neurology clinic for a nerve conduction study. AR 264. She was also prescribed bilateral wrist braces. *Id*.

When seen at the eye clinic on August 20, 2008, the examination noted that the Plaintiff was "not on medical treatment" for MS. Optic neuropathy and myopia were assessed. AR 260.

On August 21, 2008, Plaintiff complained of moderately severe burning type pain in her hip. AR 258. She claimed to have been experiencing this for six months. She denied any dizziness. It was noted that her hypertension was controlled. AR 258. For acute pain, she was prescribed 600 milligrams of Ibuprofen. AR 259.

The results of the nerve conduction study done on August 29, 2008, revealed bilateral carpal tunnel syndrome, moderate on the left and mild on the right. Normal findings were reported for the bilateral ulnar motor sensory and radial potentials. AR 275.

On November 11, 2008, treatment notes reflect improved strength regarding the CTS; Plaintiff advised to wear braces while driving. AR 254.

On December 16, 2008, Plaintiff reported back pain and fever and chills after taking her first injection of Betaseron. The prescription for 600 milligrams of Ibuprofen was refilled. AR 250.

On December 23, 2008, Plaintiff complained of pain in her right hip, assigning the pain an eight on a ten point scale. MS, CTS, hypertension, and obesity were noted. AR 247-249.

An eye examination of February 11, 2009, revealed no change in the status of Plaintiff's eye problems. The physician noted optic neuropathy in Plaintiff's right eye and ordered she be followed. AR 251.

On March 17, 2009, Plaintiff was seen in emergency for pain in her right hip and leg that she had been experiencing for one week. She did not report any trauma. AR 244. On physical examination, the doctor noted normal findings overall, yet noted an antalgic gait. The doctor's clinical impression was sciatica. Prescriptions for Vicodin and Elavil were provided and pain medications were administered. AR 245.

On April 9, 2009, Plaintiff complained of right hip pain for the previous year, radiating from the buttock. The pain worsened with activity. AR 241. The doctor diagnosed right hip pain, hypertension, MS with optic neuritis, bilateral CTS, and obesity. *Id*. The physician recommended Plaintiff lose weight and take medications as prescribed. AR 243.

A radiology report dated May 15, 2009, revealed no fracture of Plaintiff's pelvis or right hip. Mild degenerative changers were noted in both hips. AR 282.

Finally, Jennel Constantino, a medical resident at KMC, provided a "To whom it may concern" letter dated May 15, 2007, wherein the doctor indicated Plaintiff has "difficulty doing activities of daily living" due to MS and was "unable to maintain any type of gainful employment" as a result. The doctor noted the prognosis was guarded, and it was anticipated Plaintiff's disability would "extend beyond one year." AR 288.

***Paul Frye, M.D.***

On July 19, 2007, state agency physician Paul F. Frye was consulted regarding Plaintiff's application for benefits. The doctor noted that as of June 14, 2007, Plaintiff was no longer experiencing vertigo or dizziness, and therefore, he found those symptoms had resolved. Dr. Frye also noted Plaintiff was no longer experiencing any symptoms of MS. Additionally, the medication prescribed to treat her high blood pressure/hypertension was keeping the condition moderately controlled. Finally, the doctor opined that she had not been medically impaired for at least twelve months. AR 194-195.

### *Elpidio A. Fonte, M.D.*

On October 10, 2007, non-examining physician, Dr. Elpidio A. Fonte reviewed Plaintiff's medical records. The doctor opined that there were no neurological symptoms present following the MS diagnosis. Plaintiff's complaints of lower back pain were noted to be "without any prior history or trauma." AR 229. In addition, the doctor agreed that Plaintiff had not been medically impaired for a period of twelve months. *Id*.

**ALJ's Findings**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since May 31, 2007, and had medically determinable impairments including: MS, vertigo, hypertension, bilateral carpal tunnel syndrome, mild right hip degenerative disease, neck pain, and depression. AR 10.

Based on his review of the medical evidence, the ALJ determined that Plaintiff did not have any severe impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for a period of twelve consecutive months. AR 10. In addition, the ALJ found that the Plaintiff had not been under a disability, as defined by the Social Security Act, since May 31, 2007, the date of her initial application for benefits. AR 10-13. Therefore, Plaintiff was not disabled as defined by the act. *Id*.

### **SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial

evidence. 42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since May 31, 2007; (2) does not have an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or

combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for twelve consecutive months (20 C.F.R. § 416.921); and (4) has not been under a disability, as defined in the Social Security Act, since May 31, 2007, the date the application was filed (20 CFR § 416.920(c)). AR 11-13.

Here, Plaintiff argues that the ALJ's finding of no severe impairment cannot withstand scrutiny because it is not supported by substantial evidence, and is the result of legal error. More particularly, Plaintiff argues the ALJ erred by failing to discuss and consider all the evidence of Plaintiff's impairments for the following reasons: (1) Plaintiff has continued complaints of vertigo; (2) her right hip condition is severe and requires prescription Ibuprofen; (3) her bilateral CTS is a severe impairment; (4) Plaintiff's MS is a severe impairment; (5) the ALJ gave undue weight to the opinion of the state agency physician Paul Frye, M.D.; and (6) the ALJ failed to discuss and consider the Plaintiff's obesity as a contributing factor to her disability. (Doc. 12 at 9-14.)

## DISCUSSION

*Step Two Findings*

Plaintiff argues that the ALJ failed to find her medically determinable impairments to be severe at step two of the sequential evaluation process, and that he further erred by not considering the cumulative effect of her multiple impairments. (Doc. 12 at 11-16.) Defendant counters that the ALJ's step two determination is supported by substantial evidence. (Doc. 18 at 5-9.)

At step two of the sequential evaluation process, the ALJ must conclude whether Plaintiff suffers from a "severe" impairment. The regulations define a non-severe impairment as one that does not significantly limit the claimant's physical and mental ability to do basic work activities. An impairment is not severe "if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'" *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). To satisfy step two's requirement of a severe impairment, the claimant must prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone

10

will not suffice. 20 C.F.R. §§ 404.1508; 416.908. The effects of all symptoms must be evaluated on the basis of a medically determinable impairment which can be shown to be the cause of the symptoms. 20 C.F.R. §§ 404.1529, 416.929. An overly stringent application of the severity requirement violates the statute by denying benefits to claimants who do meet the statutory definition of disabled. *Corrao v. Shalala,* 20 F.3d 943, 949 (9th Cir. 1994).

The step two inquiry is a *de minimis* screening device to dispose of groundless or frivolous claims. *Bowen v. Yuckert,* 482 U.S. 137, 153-154 (1987). The ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe. 42 U.S.C. § 423(d)(2)(B). The combined effect "shall be considered throughout the disability determination process." *Id*. Further, when a claimant suffers from multiple impairments, the Commissioner must consider their combined effect without regard to whether any such impairment, if considered separately, would be of sufficient medical severity, in determining whether the claimant is disabled. *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir.1988), *Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987). The adjudicator's role at step two is further explained by Social Security Ruling ("SSR") 85-28:

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.

The ALJ identified Plaintiff's MS, vertigo, hypertension, bilateral CTS, mild right hip degenerative disease, neck pain and depression as medically determinable impairments. AR 10. Nonetheless, the ALJ found none of the impairments were severe. He reasoned as follows: "In terms of the alleged vertigo, as of June 14, 2007 this condition was noted to be resolved. With respect to the claimant's high blood pressure, she did not contend any limitations or difficulties . . . [and] as of August 21, 2008 . . . [the hypertension] was controlled. The claimant's right hip pain is the result of mild degenerative arthrosis. Despite the complaints of allegedly disabling symptoms...claimant has only taken over-the-counter ibuprofen...The claimant alleged bilateral carpal tunnel syndrome for the first time at the hearing. While there is objective evidence

supporting a diagnosis . . . the claimant testified that her symptoms have lessened . . . treatment has been conservative . . . and there has been no discussion with respect to surgical intervention." *Id*.

Further, the ALJ discussed Plaintiff's alleged impairments related to MS by noting that according to the objective evidence presented, " . . . she only had one episode related to this disease in 2007 . . . [after beginning] her weekly injection in December 2008 and as recent as February 2009, her physician noted she was doing better." In addition, the ALJ noted that Plaintiff is able to drive without limitation other than being retested every two years due to the MS. The ALJ reasoned therefore "that she is able to read and . . . see appropriately." AR 12.

Regarding her foot drop, Plaintiff alleged the need to utilize a cane, however the ALJ noted she, "was able to attend the hearing without [it]," and even able to use the stairs when the broken elevator necessitated it. AR 12.

Thus, the ALJ determined that these impairments do not significantly limit her physical and mental ability to perform basic work activities. See *Smolen v. Chater*, 80 F.3d at 1290.

Plaintiff is correct that when a claimant suffers from multiple impairments, the Commissioner must consider their combined effect without regard to whether any such impairment, if considered separately, would be of sufficient medical severity, in determining whether the claimant is disabled. *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir. 1988), *Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987).

Here, although Plaintiff does have multiple medically determinable impairments, the medical record evidence and testimonial evidence do not reflect that the cumulative effect of these impairments is enough to establish medical severity or to significantly impair Plaintiff's ability to carry out basic daily activities.

Plaintiff argues that the ALJ falsely represented Plaintiff's use of Ibuprofen as over-the-counter. It is true that on more than one occasion Plaintiff was *prescribed* at least 600 milligrams of Ibuprofen. Additionally, on two occasions she was prescribed Vicodin for the pain in her hip, leg, lower back pain, and headaches. AR 216, 259, 245. However, the record does not reflect that her prescriptions were continuous other than occasional requests for refills of Ibuprofen. AR

245, 250, 259. Neither did Plaintiff nor her attorney clarify at the administrative hearing whether the Ibuprofen she was taking was over-the-counter versus prescription. AR 26. While failure to notice this discrepancy could be considered a slight error in observation by the ALJ, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) [citing *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990]).

### *Dr. Frye's Opinion*

Plaintiff argues that the ALJ erred in giving probative weight to state agency medical consultant Dr. Frye, as Dr. Frye did not have access to or consider some of the later medical records and diagnoses that were made after his determination. (Doc. 12 at 4.) Defendant contends, "that it was proper for the ALJ to rely in part on the opinion of Dr. Frye." (Doc. 18 at 6.)

Generally, more weight is given to the opinion of a source who has examined the plaintiff than to the opinion of a source who has not examined the plaintiff. 20 C.F.R. § 404.1527(d)(1). The opinions of the state agency medical consultants can be given weight only insofar as they are supported by evidence in the record, considering such factors as the supportablility of the opinion in the evidence, including any evidence received at the administrative hearing and Appeals Council level that was not before the state agency, the consistency of the opinions with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency medical consultant. SSR 96-6p.

Here, non-examining physician Dr. Frye's findings are consistent with the findings of the examining physicians - Plaintiff's impairments were not severe. For instance, the degenerative hip disease had not yet been diagnosed at the time of Dr. Frye's decision, however, the examining radiologist opined it was no more than a "mild" degeneration and "unremarkable." AR 282-283. Plaintiff argues that the sensory nerve conduction test used to determine Plaintiff's bilateral CTS was not available to Dr. Frye. (Doc. 12 at 14.) Again, upon diagnosis, the examining physician opined that the CTS was "moderate on the left . . . mild on the right." AR 274-275. Diagnoses of mild to moderate ailments after Dr. Frye's decision are consistent with prior medical evidence wherein no severe impairments were shown to exist. Therefore, the later

medical records do not provide any additional evidence of severity in impairments or any substantial limitations on Plaintiff's ability to perform basic daily activities.  Therefore, the ALJ did not err in relying upon the opinion of Dr. Frye.

### *Obesity*

Finally, Plaintiff argues that the ALJ's failure to consider her obesity and its impact on her functioning was error. (Doc. 12 at 14-15.) Defendant counters that it is Plaintiff's burden to prove her disabilities. (Doc. 18 at 8.)

SSR 02-1p states that "[o]besity is a complex, chronic disease characterized by excessive accumulation of body fat." It further states that obesity "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems," and "may also cause or contribute to mental impairments such as depression." SSR 02-1p also requires an ALJ to consider an individual's obesity at steps two through five of the sequential evaluation, and requires that obesity be considered in combination with the individual's other impairments. It also states that "[an adjudicator] will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. [The adjudicator] will evaluate each case based on the information in the case record." Ninth Circuit case law also requires an ALJ to determine the effect of a claimant's obesity on his or her other impairments. See *Celaya v. Halter*, 332 F.3d 1177 (9th Cir. 2003). However, an "ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch v. Barnhart*, 400 F.3d at 683.

Here, the record does not indicate that Plaintiff's obesity exacerbated her other impairments nor was it raised in Plaintiff's report of symptoms. While Plaintiff's obesity is frequently noted by several physicians, none have indicated that Plaintiff's obesity adds to her limitations. There is a passing reference to the fact Plaintiff should lose weight.  *See* AR 243. Notably too, like the claimant in *Burch*, Plaintiff was represented by counsel. Yet she presented

no testimony that her obesity impaired her ability to work or that it affected her daily activities in any way. AR 14-36. Simply put, Plaintiff has failed to demonstrate or identify evidence of any functional limitation related to her obesity. *Burch*, 400 F.3d at 684.

In sum, the step two finding by the ALJ that Plaintiff's multiple medically determinable impairments were non-severe is supported by substantial evidence in the record and free of legal error.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Mamie L. Shelton.

IT IS SO ORDERED.

Dated:   **March 7, 2011**                              /s/ **Gary S. Austin**
                                                      UNITED STATES MAGISTRATE JUDGE